**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| NERINGA VENCKIENE, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | 18 C 3061 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Virginia M. Kendall |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The Republic of Lithuania has requested the extradition of Neringa Venckiene pursuant to the Extradition Treaty between the United States and Lithuania to face criminal charges pending against her in her native country. Consistent with the extradition process set forth in 18 U.S.C. § 3184, Magistrate Judge Daniel Martin held a hearing and entered an order certifying Venckiene as extraditable, *see In re Extradition of Neringa Venckiene*, No. 18 CR 56 (N.D. Ill. Feb. 21, 2018), after which the Secretary of State reviewed the matter and issued a warrant for her surrender to the Lithuanian government. (*Id.* at Dkt. 29, Ex. A). On April 30, 2018, Venckiene filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. §2241, seeking review of Judge Martin's Order certifying her as extraditable and the Secretary of State's authorization of her surrender. (Dkt. 1). On May 7, 2018, Venckiene filed a Motion for Extension of Stay, seeking to stay her surrender until after her habeas petition has been decided. (Dkt. 9). Venckiene's Petition and Motion raise serious issues concerning the United States' extradition process and propriety of her native country's political and judicial systems. However, given the narrow scope of habeas review in extradition proceedings and the burdensome showing required to obtain a stay, this Court's authority to provide Venckiene the relief sought in her Motion is quite limited. Of course, in

addressing the issues raised by Venckeine's Petition and Motion, this Court must respect the right of sovereign nations to enact and enforce their own criminal laws and the principle of comity underpinning the mutual legal assistance treaties entered between nations to facilitate international rule of law and the very protection of those rights. For the following reasons, Venckiene's Motion for Extension of Stay (Dkt. 9) is denied.

## **BACKGROUND**

### I. **Request for Extradition and Arrest**

On January 26, 2018, the Government filed a Criminal Complaint before Magistrate Judge Weisman requesting that the court issue a warrant for the arrest of Neringa Venckiene in accordance with 18 U.S.C. § 3184 and the Extradition Treaty between the United States and the Republic of Lithuania (the "Treaty"). (*See USA v. Venckiene*, No. 18 CR 56 (N.D. Ill.) at Dkt. 1). The Complaint stated that the Government of Lithuania had submitted a formal request through diplomatic channels for the extradition of Venckiene pursuant to the Treaty to face charges issued against her for the following offenses allegedly committed in Lithuania:

1. complicity in committing a criminal act (unlawful collection of information about a person's private life, *i.e.*, stalking), in violation of Lithuania Criminal Code Article 25;

2. unlawful collection of information about a person's private life, *i.e.*, stalking, in violation of Lithuania Criminal Code Article 167;

3. hindering the activities of a bailiff, in violation of Lithuania Criminal Code Article 231;

4. failure to comply with a court's decision not associated with a penalty, in violation of Lithuanian Criminal Code Article 245;

5. causing physical pain, in violation of Lithuania Criminal Code 1a0(1); and

6. resistance against a civil servant or a person performing the functions of public administration, in violation of Lithuania Criminal Code Article 286.

(*Id.*).

Judge Weisman issued the arrest warrant the same day. (*Id.* at Dkt. 3). On February 13, 2018, Venckiene was arrested and appeared before Magistrate Judge Rowland. (*Id.* at Dkt. 9).

## II.     Proceedings before Magistrate Judge Martin

On February 21, 2018, Magistrate Judge Martin held an extradition hearing and, that same day, issued an Order granting the Government's extradition request and finding the Treaty encompassed the crimes charged, the warrants and documents provided by the Government of Lithuania in support of its request for extradition were properly authenticated, and the commission of two of the crimes charged—"hindering the activities of a judge, prosecutor, pre-trial investigation officer, lawyer, or bailiff" and "resistance against a civil servant or a person performing the functions of public administration for which extradition is sought"—was established by probable cause that would justify commitment for trial if the offense had been committed in the United States. (*Id.* at Dkt. 14). The Order indicated that the hearing lasted two hours. (*Id.*).

On February 23, 2018, Judge Martin issued a Certification and Committal for Extradition, certifying Venckiene as extraditable for the following offenses: hindering the activities of a bailiff, failure to comply with a court's decision not associated with a penalty, causing physical pain, and resistance against a civil servant or a person performing the functions of public administration. (*Id.* at Dkt. 18). The Certification and Committal also committed Venckiene to the custody of the U.S. Marshals pending the Secretary of State's decision on extradition and surrender. (*Id.*). That same day, the Government sent Venckiene's attorney a letter, notifying him of the next steps in the extradition process. (*Id.* at Dkt. 24-1). The letter also notified Venckiene's counsel that the Secretary may make its decision at any time after Certification, that surrender typically takes place within two months if the extradition request is granted, and that Judge Martin's Certification was

not directly appealable but Venckiene could seek limited review of the Certification by filing a habeas petition in the district court. (*Id.*). The letter explained further:

> If a habeas petition is filed, the Secretary will suspend review of the extradition matter, and will resume review only when and if the district court denies the petition. Consequently, there is no need to obtain any form of stay, provided that the habeas petition has been filed. However, the Secretary will proceed with the decision-making absent such filing.

(*Id.*).

On February 26, 2018, the court mailed a copy of the Certification and Committal for Extradition and all documents filed on the docket to the Secretary of State. That same day, Venckiene filed a Motion to Stay certification of the extradition pending the filing and resolution of a habeas petition, stating that she wished to file a habeas petition challenging the court's probable cause findings and, in the alternative, arguing that the offenses charged were subject to the "political offense" exception to the Treaty. (*Id.* at Dkt. 20). The Government objected on the grounds that a stay would not be necessary because the Secretary of State would not issue a warrant until at least 30 days after the entry of the Certification Order, during which time Venckiene could seek habeas relief, thereby automatically suspending the Secretary's review of the extradition matter, or submit additional materials to the Secretary of State for consideration. (*Id.* at Dkt. 24). On March 7, 2018, Judge Martin denied Venckiene's Motion to Stay. (*Id.* at Dkt. 25).

Venckiene submitted materials to the Secretary of State but did not file a habeas petition. (*Id.* at Dkt. 29).

On April 20, 2018, the Secretary of State authorized Venckiene's surrender pursuant to the Treaty. (*Id.* at Dkt. 29, Ex. A). Venckiene's counsel was notified of the decision by letter dated April 23, 2018. (*Id.*). The Secretary did not specify the reasons for its decision in the letter but stated the decision was based on "a review of all pertinent information, including pleadings and filings submitted on behalf of Ms. Venckiene" up to and including April 19, 2018. (*Id.*).

On April 25, 2018, Venckiene filed a Motion to Stay Extradition before Judge Martin, requesting that the court stay certification of the extradition order or set a hearing at which she could present additional evidence in support of the requested stay. (*Id.* at Dkt. 29). The Government opposed the motion, arguing primarily that Venckiene essentially sought a stay of her surrender (not of the court's certification) and that the court no longer had jurisdiction to stay Venckiene's surrender following the Secretary of State's decision. (*Id.* at Dkt. 31). The Government explained that courts typically only exercised authority to issue a stay in extradition proceedings pursuant to habeas corpus proceedings initiated *before* the Secretary issued its extradition determination (which did not occur in Venckiene's case) and that the Government knew of no reported case in which the court issued a stay *following* the Secretary of State's determination. (*Id.*).

Venckiene's noticed up her Motion before Judge Martin for May 1, 2018. (*Id.* at Dkt. 30). Prior to that date, on April 30, 2018, Venckiene filed a Petition for a Writ of Habeas Corpus in this Court. At the May 1 hearing, in light of Venckiene's habeas petition, Judge Martin granted Venckiene's Motion to Stay Extradition only through and including May 10, 2018—the earliest date the matter could be brought before this Court. (*Id.* at Dkt. 33; *see also* Dkt. 9).

## III.    Proceedings before this Court

As stated above, Venckiene filed a Petition for a Writ of Habeas Corpus in this Court on April 30, 2018. (Dkt. 1). The Petition requests that the Court prevent her extradition to Lithuania for the following reasons: the offenses charged fall under the "political offense" exception of the Treaty; the Magistrate Judge erred in finding probable cause existed as to two of the offenses; and the extradition scheme violates due process to the extent the Secretary can make its determination without providing any basis for its ruling. (*Id.*.).

On May 7, 2018, Venckiene filed a Motion for Extension of Stay to extend the stay issued by Judge Martin until such time that her habeas petition can be heard or, in the alternative, to set a briefing schedule and a hearing date on the requested stay. (Dkt. 9). The Government opposed the Motion on essentially the same grounds it opposed Venckiene's prior motion before Judge Martin: that the Court has no authority to review the substance of the Secretary of State's extradition determination or to review Judge Martin's certification order now that the Secretary has made its decision; if the Court has authority to review the Secretary of State's extradition determination, Venckiene cannot show a due process flaw in the U.S. extradition scheme; and if the Court has authority to review Judge Martin's certification order, Venckiene cannot make a strong showing she is likely to succeed on the merits of her habeas petition. (Dkt. 11).

The Court held a hearing on Venckiene's Motion on May 10, 2018 and ordered Petitioner to file a reply in support of her Motion for Extension of Stay. (Dkt. 12). The Court held another hearing on the fully-briefed Motion on June 28, 2018. (Dkt. 26). In response to the Court's questions at the June 28 hearing, Venckiene raised additional arguments in support of her Motion and Petition, including that the Secretary of State allegedly based its determination on a constitutionally impermissible basis and that two Congressmen had introduced separate bills that if passed would prevent Venckiene's extradition until her pending asylum case was heard. (*See* Dkt. 30). The Court directed Venckiene to present these new arguments in a supplemental brief to the Court. Venckiene filed her supplemental brief on July 5, 2018. (*Id.*).

## DISCUSSION

In her habeas petition, Venckiene challenges both the Secretary of State's extradition determination and Judge Martin's Order certifying her as extraditable. Venckiene must show first that this Court has authority at this stage to review either ruling. If the Court finds that it can hear

Venckiene's habeas petition on either ground, it must then decide whether to stay Venckiene's extradition until such petition is heard. Venckiene also argues that her extradition should be stayed until Congress votes on the two pending bills that would prevent her extradition until her asylum case is heard.

The Court considers four factors in determining whether to grant a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).[1] The first two factors are the "most critical." *Id.* A stay is not a matter of right, "even if irreparable injury might otherwise result." *Id.* at 433 (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)). The party requesting a stay "bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *Id.* at 433–34.

## I.    The Secretary of State's Extradition Determination

Title 18 U.S.C. § 3184 provides the following extradition scheme where a treaty for extradition exists between the United States and a foreign government: the Government files a complaint in federal court charging a person with having committed crimes covered by the applicable treaty in the jurisdiction of the foreign government, the magistrate judge issues a warrant for that person's arrest and hears evidence as to the charges, and if the magistrate judge "deems the evidence sufficient to sustain the charge[s]," he "shall certify [his or her findings] . . . to the Secretary of State." 18 U.S.C. § 3184. The Secretary of State then decides whether to

---

[1] These are the "traditional" stay factors. *Nken*, 566 U.S. at 425-26. The parties do not dispute that these factors govern Venckiene's Motion.

surrender the individual to the requesting foreign government. *Matter of Assarsson*, 670 F.2d 722, 725 (7th Cir. 1982) (citing 18 U.S.C. § 3186)). "If the case is certified to the Secretary for completion of the extradition process it is in the Secretary's sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981); *see also DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113 (7th Cir. 1997) ("A certificate of extradition is no different from a search warrant or an order approving a deportation: it authorizes, but does not compel, the executive branch of government to act in a certain way."); *In re Extradition of Fulgencio Garcia*, 188 F. Supp. 2d 921, 924 (N.D. Ill. 2002) ("The final decision on whether or not to extradite the fugitive is reserved to the Secretary of State."); *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993) ("Extradition ultimately remains an Executive function. After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender.")

Under the rule of non-inquiry, the Secretary of State has sole authority to consider other factors such as the requesting state's political motivations, whether the requesting state's justice system is fair, and whether the request should be denied on humanitarian grounds. *Eain*, 641 F.2d at 513 (7th Cir. 1981) ("It is the settled rule that it is within the Secretary of State's sole discretion to determine whether or not a country's requisition for extradition is made with a view to try or punish the fugitive for a political crime, *i.e.*, whether the request is a subterfuge."); *Matter of Extradition of Noeller*, No. 17- CR 664, 2018 WL 1027513, at *7 (N.D. Ill. Feb. 23, 2018) ("[T]he Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds."). Magistrate judges are precluded from considering such factors. *See,*

*e.g.*, *In re Extradition of Salas*, 161 F. Supp. 2d 915, 927 (N.D. Ill. 2001) ("The prevailing case law is to the effect that an extradition detainee's claim that he will be mistreated, denied a fair trial, deprived of his constitutional and human rights, or even deprived of his life if returned to the requesting sovereign is not a proper matter for consideration by the certifying Magistrate Judge. It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."); *Martin*, 993 F.2d at 829 (11th Cir. 1993) ("The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not."). "This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is 'purely a national act . . . performed through the Secretary of State.'" *Matter of Extradition of Noeller*, 2018 WL 1027513, at *7 (quoting *In re Kaine*, 55 U.S. 103, 110 (1852)). It is also vital to the very concept behind mutual legal assistance treaties, the purpose of which is to facilitate cooperation between nations in order to protect the sovereignty of each, to the extent possible without violating respective constitutional beliefs.

Accordingly, the Secretary of State's extradition determination is generally not subject to judicial review. *See, e.g., Martin*, 993 F.2d at 829 ("The Secretary of State's decision is not generally reviewable by the courts."); *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("Assuming that the magistrate's decision is in favor of extradition, the Executive's discretionary determination to extradite the fugitive . . . is not generally subject to judicial review. The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs."). However, the Seventh Circuit has recognized as a narrow exception to this general rule that the Executive's conduct in making its extradition determination is subject to some constitutional constraints. *See Matter of Burt*, 737

F.2d 1477, 1484 (7th Cir. 1984) ("[F]ederal courts undertaking habeas corpus review of extraditions have the authority to consider . . . the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights."). The court in *Matter of Burt* explained:

> Generally, so long as the United States has not breached a specific promise to an accused regarding his or her extradition and bases its extradition decisions on diplomatic considerations without regard to such constitutionally impermissible factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly atrocious procedures or punishments employed by the foreign jurisdiction, those decisions will not be disturbed.

*Id.* at 1487. Other courts have also recognized constitutional limitations on the Executive's discretion in extradition proceedings. *See, e.g., Martin*, 993 F.2d at 829 ("The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution."); *Plaster v. United States*, 720 F.2d 340, 349 (4th Cir. 1983) (The Secretary of State and the President "may not choose to extradite an individual where such extradition would, in the opinion of the judiciary, violate the individual's constitutional rights.").

Venckiene challenges the constitutionality of the Secretary of State's determination on three grounds. First, Venckiene alleges that the extradition scheme violated her procedural due process rights because the Secretary of State did not specify the basis for its determination. Second, Venckiene alleges that she "is being punished for her political beliefs, *e.g.,* her criticism of the Lithuanian government and judiciary." (Dkt. 29 at ¶ 13). Third, Venckiene argues that Lithuania employs particularly atrocious procedures inimical to the constitutional protections of the United States. (*Id.* at ¶ 12). Venckiene raised the second and third grounds for the first time in the supplemental briefing filed after the Court's June 28 hearing.

### *1. Procedural Due Process*

Venckiene's procedural due process claim does not fall within the narrow reviewable categories listed in *Matter of Burt* because it does not allege that the Secretary of State based its decision on constitutionally impermissible factors, *i.e.*, her race, sex, or political beliefs, or that Lithuania employs particularly atrocious procedures or punishments. Venckiene does not cite to any case law to support her procedural due process claim or to show that the Secretary of State's determination is subject to such claim.[2]

However, there is case law supporting the position that this Court can hear a procedural due process challenge to the Secretary of State's determination. In *Matter of Burt*, the petitioner alleged that the executive branch violated his due process rights under the Fifth Amendment by filing a complaint to extradite him 15 years after initially deciding not to do so. 737 F.2d at 1484. There, however, the petitioner challenged the decision to file the complaint, not the final decision to surrender the individual to the foreign nation.[3] The Fourth Circuit's decision in *Peroff v. Hylton* and the Fifth Circuit's decision in *Escobedo v. United* States are more on point here. 563 F.2d 1099, 1102 (4th Cir. 1977); 623 F.2d 1098, 1105 (5th Cir. 1980).

In *Peroff v. Hylton*, the petitioner filed a habeas petition challenging the Secretary of State's decision to grant extradition alleging he was denied due process by the Secretary of State's refusal to conduct a hearing prior to issuing the warrant of extradition. 563 F.2d at 1102. In *Escobedo*,

---

[2] In the Jurisdiction section of her habeas petition, Venckiene cites to cases standing for the narrow principle that the Secretary of State's extradition determination is subject to judicial review on a habeas petition where the petitioner seeks relief under the Convention Against Torture (CAT) or Foreign Affairs Reform and Restructuring Act (FARR Act). *See, e.g., Prasoprat v. Benov,* 622 F. Supp. 2d 980, 983-87 (C.D. Cal. 2009) (CAT provided for judicial review of Secretary's extradition decision); *Hoxha v. Levi,* 465 F.3d 554, 564 (3d Cir. 2006) (finding that challenge to extradition under FARR was not ripe until the Secretary had ruled). These cases have no bearing on Venckiene's Petition or Motion because she has not made any claim for relief under the CAT or FARR Act.

[3] The court in *Matter of Burt* held that it was appropriate for the court to hear the petitioner's due process challenge to the executive branch's actions in the extradition proceedings but ultimately found that the executive branch had not violated petitioner' due process rights because it was not fundamentally unfair when the government "as extraditer [] makes decisions responsive to diplomatic concerns that may secondarily affect the accused's ability to respond to criminal charges brought by a foreign state." 737 F.2d at 1486.

the petitioner filed a habeas petition and argued, among other things, that the discretion provided to the executive branch under the applicable treaty violated due process because it provided no standards to guide the exercise of discretion. 623 F.2d at 1104-05. In both cases, the court heard and decided the petitioner's due process challenge, suggesting this Court has the authority to do the same here. The Court finds these cases persuasive.

However, this does not help Venckiene much because both courts also rejected the petitioner's arguments. In *Peroff*, the petitioner argued that the Secretary of State's exercise of discretion constituted an "administrative determination" and, therefore, that the Secretary violated his right to due process by denying him a "fair hearing" before issuing the warrant of extradition. 563 F.2d at 1102. The court held that a person facing extradition has no constitutional right to notice or hearing before the Secretary of State, explaining:

> Although limited judicial review is available by way of a petition for habeas corpus relief, matters involving extradition have traditionally been entrusted to the broad discretion of the executive. A person facing interstate extradition has no constitutional right to notice or a hearing before the governor who acts upon the extradition request. The need for flexibility in the exercise of Executive discretion is heightened in international extradition proceedings which necessarily implicate the foreign policy interests of the United States. Thus, while Congress has provided that extraditability shall be determined in the first instance by a judge or magistrate, [] the ultimate decision to extradite is ordinarily a matter within the exclusive purview of the Executive. Peroff has no statutory right to the hearing he seeks; indeed, agency actions involving "the conduct of . . . foreign affairs functions" are expressly exempted from the hearing requirements set out in The Administrative Procedure Act.

563 F.2d at 1102-03 (emphasis added). The court explained further that the hearing before the magistrate judge and habeas corpus review afforded to the petitioner satisfied the requirements of procedural due process. *Id.* Similarly, in *Escobedo*, the court refused to "prescribe the procedure by which the Executive exercises its discretion" in extradition proceedings and rejected petitioner's argument that such discretion should be confined within specific standards. 623 F.2d

at 1105 (citing *Peroff*, 563 F.2d at 1103). Therefore, while the Court has the authority to hear Plaintiff's procedural due process challenge based on the Secretary's failure to specify the basis for its extradition determination, Venckiene has failed to make a strong showing that she is likely to succeed on that claim.

The remaining factors under *Nken* also favor denying a stay. The irreparable harm Venckiene will suffer if the stay is denied is that, as with any person whose stay of extradition is denied, her outstanding legal claims pertaining to extradition would become moot. However, that hardship is lessened by the fact that she still may defend herself before the Lithuania courts. *See, e.g., Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) ("The possibility of irreparable injury to Artukovic if we deny his motion is evident: his appeal will become moot and will be dismissed since the extradition will have been carried out. The balance of hardships, however, is tempered by Artukovic's ability to defend himself at trial in Yugoslavia.").

Venckiene argues that she also has legitimate concerns for her life and physical safety if she is extradited. However, as explained above, the Secretary of State retains sole discretion over such humanitarian considerations and inquiries into the fairness of the foreign nation's judicial system; the magistrate judge may not consider such factors and the Secretary's decision on those bases is not subject to judicial review. It is also worth noting that this is not a case in which the petitioner faces a lifetime of imprisonment or other serious penalty if convicted upon extradition. Venckiene faces at most three years imprisonment if convicted of the charges pending against her. Although Venckiene claims that she fears for her life, this fear is not a fear that her own Government will kill her but is based instead on threats from outside forces not controlled or under any authority of the Lithuanian government and, therefore, the type of claim more properly brought before an asylum court. Moreover, Venckiene offers only circumstantial evidence of the alleged

conspiratorial threat against her. A sovereign nation has the right to weigh the evidence of such claims within its own judicial system, and a United States district court should not intervene with that analysis.

Regardless, irreparable harm alone is not sufficient to justify a stay; Venckiene must also show a likelihood of success on the merits to obtain a stay and she has failed to do here. *Nken*, 556 U.S. at 438-39 ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other.") (Kennedy J., concurring).

Finally, the Court looks to the third and fourth factors: harm to the opposing party and the public interest. When the Government is the opposing party, these two factors merge. *Id.* at 435. There is always a public interest in prompt execution of removal orders. *Id.* at 436. Additionally, "proper compliance with a valid extradition request promotes relations between the two countries and enhances efforts to establish an international rule of law and order." *Artukovic*, 784 F.2d at 1356. The Court agrees with the Government that "the United States can reasonably expect foreign governments to honor their obligations to the United States only if it honors theirs." (Dkt. 11 at 31). Again, Venckiene argues only that it is in the public interest to grant a stay because Lithuania's request is politically motivated. Venckiene provides no case law to support her position; regardless, as explained above, the Secretary has sole discretion to consider whether the request is politically motivated.

Therefore, the remaining factors also favor denying Venckiene's request for a stay. Venckiene bears the burden of establishing the circumstances justify an exercise of the Court's discretion in granting a stay. *Nken*, 556 U.S. at 426. She has failed to do so with regard to her procedural due process claim.

## 2. Constitutionally Impermissible Basis

At the June 28 hearing, the Court asked Venckiene's counsel whether the habeas petition included a challenge to the Secretary of State's determination on the basis that the Secretary based its decision on constitutionally impermissible factors, and Venckiene's counsel represented that they would address this argument in a supplemental brief. (Dkt. 30 at 15). In the supplemental brief, Venckiene devotes just one paragraph to this argument and provides no case law in support thereof. Specifically, Venckiene argues that the fact that the Lithuanian government eliminated Venckiene's judicial and parliamentary immunity and initiated the prosecution against her as punishment for exercising what in the United States would be her First Amendment rights is evidence that "Petitioner is being punished for political beliefs, *e.g.,* her criticism of the Lithuanian government and judiciary." (Dkt. 29 at ¶ 13).

Venckiene's argument is not only underdeveloped but confuses the exception set forth in *Matter of Burt* and discussed at the June 28 hearing. Pursuant to *Matter of Burt*, the Secretary of State may not base its extradition determination on constitutionally impermissible factors such as an individual's political beliefs, and the Court has authority to review the Secretary's determination to assess whether such constitutionally impermissible factors played any part in that determination. Venckiene makes no such argument here. Rather, Venckiene's position as set forth in the supplemental brief focuses on the Lithuanian government's basis for its decision to prosecute her. Under the rule of non-inquiry, the Secretary of State retains sole authority to consider Lithuania's political motivations in requesting Venckiene's extradition and such diplomatic considerations are not subject to judicial review. Therefore, the Court has no authority to hear Venckiene's habeas petition on this basis.

## 3. Particularly Atrocious Procedures or Punishments

Finally, Venckiene argues that Lithuania employs "particularly atrocious procedures or punishments." Venckiene points to the allegations in her Petition that the government allegedly extended an expired statute of limitations in 2011 in order to continue an investigation into possible charges against her for "humiliating the court" and *ex post facto* eliminated her judicial immunity and parliamentary immunity in order to prosecute her. (Dkt. 29 at ¶ 12). Venckiene also points to excerpts of articles reporting that courts in a handful of countries have denied extradition requests from Lithuania because of inhuman prison conditions, which she contends "would likely rise to the level of an Eighth Amendment violation of American law." (*Id.*).

"It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Sahagian v. United States*, 864 F.2d 509, 514 (7th Cir. 1988). "Such an assumption would directly conflict with the principle of comity upon which extradition is based." *Id.* Accordingly, the Supreme Court held long ago that a petitioner cannot prevent her extradition simply by alleging that the criminal process she will receive from the requesting country fails to accord with constitutional guarantees. *See, e.g., Esposito v. Adams*, 700 F. Supp. 1470, 1480 (N.D. Ill. 1988) (citing *Neely v. Henkel*, 180 U.S. 109, 122-23 (1901)). In *Neely*, the Supreme Court held that the rights, privileges and immunities guaranteed by the Constitution—such as the fundamental guarantees of life, liberty and property and the provisions relating to *ex post facto* laws, writ of habeas corpus and trial by jury—"have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." 180 U.S. at 122-23; *see also Munaf v. Geren*, 553 U.S. 674, 694-95 (2008) (Iraq had a sovereign right to prosecute petitioners for crimes committed on its soil "whether or not the pertinent criminal process comes with all the rights guaranteed by our Constitution") (citing *Neely*, 180 U.S. at 123); *Matter of Burt*, 737 F.2d at 1485 n.11 ("[F]oreign proceedings are not to be tested by our own

constitutional safeguards because those safeguards 'have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.'") (quoting *Neely*, 180 U.S. at 122); *Holmes v. Laird*, 459 F.2d 1211, 1219 (D.C. Cir. 1972) ("[A] surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials.") (citing *Neely*, 180 U.S. at 122). Therefore, "[o]ne who commits a crime in a foreign country 'cannot complain if required to submit to such modes of trial . . . as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty.'" *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984) (quoting *Neely*, 180 U.S. at 122-23). The Treaty between the United States and Lithuania does not protect against extended statutes of limitations, *ex post facto* laws or inhuman prison conditions.

Nonetheless, "like most legal principles, the principle of comity is not without exceptions." *Sahagian*, 864 F.2d at 514. "The Constitution may impose some limitations upon extradition decisions in exceptional cases due to some 'particularly atrocious procedures or punishments employed by the foreign jurisdiction." *Id.* (quoting *Matter of Burt*, 737 F.2d at 1487). But Venckiene fails to assert any claim that rises to this level.

Venckiene's first example of "procedures inimical to the constitutional protections in the United States" relates to an extension of the statute of limitations. Venckiene claims the head of the Judicial Council petitioned to extend the already expired limitations period for a "humiliating the court" charge in order to continue an investigation against her and the petition was granted. Constitutional challenges to the retroactive extension of an already-expired statute of limitations for a criminal offense arise under the *Ex Post Facto* Clause of the Constitution. *See* U.S. Const.

art. I, §§ 9, cl. 3 and 10, cl. 1; *see also, e.g., Stogner v. California*, 539 U.S. 607, 610 (2003) (law creating new limitations period that was passed after the prior limitations period expired, thereby authorizing prosecutions previously barred by passage of time, violated *Ex Post Facto* Clause). However, the Supreme Court in *Neely* specifically identified claims related to *ex post facto* laws as the type of allegation that can*not* serve as a basis to prevent extradition. *See Neely*, 180 U.S. at 122-23 ("provisions relating to ex post facto laws . . . have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country."). Venckiene's claims regarding *ex post facto* elimination of her judicial and parliamentary immunities fail for the same reason. Additionally, these allegations demonstrate only that Lithuanian prosecutorial and pretrial practices may not accord with the United States Constitution; they reveal *nothing* about the procedures Venckiene will face at trial or punishments she will upon conviction in Lithuania if the warrant of surrender is executed.

Venckiene next claims that if convicted in Lithuania, she would be subject to inhuman prison conditions that "would likely rise to the level of an Eighth Amendment violation of American law." (Dkt. 29 at ¶ 13). In support of this claim, Venckiene relies only on an exhibit attached to her Reply in Support of her Motion purportedly showing that "numerous other countries have denied extradition requests from Lithuania because of inhuman conditions in Lithuania prisons." (*Id.* at ¶ 12). The exhibit lists various excerpts from Lithuanian news articles, some of which report that a Northern Ireland court in 2013 refused to extradite two individuals in on grounds of poor conditions of detention, a Danish court in 2014 refused to extradite an individual citing inhuman conditions of confinement cells, and a Malta court in 2017 refused to extradite an individual to Lithuania because the conditions of detention are "equivalent to torture." (Dkt. 15-1). One article excerpt also reports that at some unidentified time, the European Court of

Human Rights approved an agreement requiring Lithuania to pay 15 prisoners €100,000 for damages from poor detention conditions. (*Id.*).[4] Venckiene provides no other evidence of the alleged inhuman conditions of Lithuanian prisons. The Court cannot determine based on these article excerpts alone whether prison conditions in Lithuania would violate the Eight Amendment much less whether they rise to the level of "atrocious" punishment warranting intervention by this Court to prevent her extradition. Additionally, prisoners regularly file and prevail in prison-conditions suits in the United States, yet courts do not assume the United States has violated the prisoners' Eight Amendment rights merely because a damages award is entered against them in such suits. There is similarly no basis to make such an assumption based on one settlement approved by European Human Rights Courts.

Of course, Venckiene need not *prove* her claim at this stage but to obtain the stay requested, she must at least show the claim will likely succeed. Unfortunately, the claim as alleged is underdeveloped and lacks the sufficient evidentiary support to meet even that burden. It is telling also that Venckiene has not sought relief under the Convention Against Torture—a claim that, if it Venckiene were able to develop it, would surely have been a better strategy for challenging Lithuania's allegedly inhuman prison conditions.

Thus, Venckiene also fails to show a likelihood of success on this third challenge to the Secretary of State's extradition determination. Because the remaining factors also favor denying Venckiene's request for a stay, the Court denies Venckiene's Motion for Extension of Stay on these grounds as well.

---

[4] The exhibit also listed excerpts from articles that are irrelevant to Venckiene's prison-conditions claim, for example, articles reporting that Russia refused to extradite individuals to Lithuania because it had granted those individuals asylum and articles reporting that Germany and the Ukraine in 2001 and 2015, respectively, each refused to extradite an individual involved in the January Events of 1991 in Lithuania for reasons not related in any way to prison conditions. (Dkt. 15-1).

Venckiene's Motion for Extension of Stay is denied with regard to all claims challenging the Secretary of State's extradition determination.

II.    **Judge Martin's Certification Order**

Venckiene also challenges Judge Martin's Order certifying her as extraditable on the grounds that the offenses charged fall within the "political offense" exception of the Treaty and that Judge Martin erred in finding probable cause existed.  Venckiene must show first that this Court has the authority to review Judge Martin's Order at this stage in the proceedings and second that the circumstances warrant a stay of her surrender until the challenge to Judge Martin's Order in her habeas petition can be heard.

A.    **The Court's Authority to Review Judge Martin's Certification Order**

A magistrate judge's decision in extradition proceedings is not directly appealable.  *Bovio v. United States*, 989 F.2d 255, 257 n.1 (7th Cir. 1993); *see also Eain*, 641 F.2d at 508.  A person may only challenge a magistrate's decision by seeking a writ of habeas corpus.  *Id.*; *see also Lindstrom v. Graber*, 203 F.3d 470, 473 (7th Cir. 2000) ("Habeas corpus is the normal method of challenging an extradition order, such an order being unappealable."); *DeSilva*, 181 F.3d at 870 ("Decisions rendered in proceedings under § 3184 are not reviewable on appeal.  Instead the person resisting extradition must seek a writ of habeas corpus under 28 U.S.C. § 2241.").  However, habeas corpus review of an extradition magistrate's order is limited to determining only "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."  *Eain*, 641 F.2d at 509 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

Here, Venckiene filed her habeas petition challenging the magistrate's decision *after* the Secretary issued its ruling authorizing her surrender pursuant to the Treaty. Venckiene asserts that this Court has jurisdiction to hear her habeas petition because "[a]lthough Petitioner could have challenged Magistrate Judge Martin's certification ruling through a petition for a writ of habeas corpus immediately, a writ may be sought at any point in the process because the order is not considered 'final' until the Secretary has rendered decision." (Dkt. 1 at 3). The Government contends that the certification ruling is subject to habeas review only until the Secretary renders its final decision and that the final ruling renders any challenge to the certification ruling moot.

Venckiene's petition raises a rare, if not novel, issue in extradition proceedings. Case law addressing whether the Court has authority to conduct habeas review of a magistrate's ruling at this stage of the extradition process is virtually nonexistent. Venckiene cites only one, non-precedential example of a case in which a court considered a habeas petition challenging the magistrate judge's certification ruling *after* the Secretary issued its ruling. In *De La Rosa Pena v Daniels*, the petitioner filed a habeas petition challenging both the Secretary's extradition determination and the magistrate judge's certification ruling, and the district court considered and decided both issues. No. 13 C 708, 2015 U.S. Dist. LEXIS 175982 (E.D. Tex. Dec. 11, 2015). The Government admits that no court has held that a person can *not* challenge a magistrate judge's certification ruling after the Secretary has made its determination. Instead, it argues that the statutory scheme governing extradition proceedings limits the judiciary's role and that any challenge to the magistrate judge's ruling would be moot at this stage.

Title 18 U.S.C. § 3184 governs extradition proceedings in the United States and provides only a limited role for the magistrate court in the extradition process: to determine whether evidence sufficient to sustain the charges exists and, if the judge finds that it is, to certify the

finding to the Secretary of State. Once the certification is entered, the magistrate court's role ends and the Secretary of State's begins. The Secretary of State then considers the court's ruling and other factors to reach its decision and has full discretion, regardless of the magistrate judge's ruling, to surrender or not surrender the individual to the foreign government. However, § 3184 does not govern the district court's authority to review the magistrate court's ruling or the Secretary of State's decision. Therefore, while the Government is correct that the statutory scheme set forth in 18 U.S.C. § 3184 provides no basis for habeas review of the magistrate's decision after the Secretary of State's decision, there is no reason to believe that it would.

Additionally, contrary to the Government's contention, a challenge to the magistrate court's ruling is not necessarily rendered moot by the Secretary of State's decision. Under the scheme set forth in 18 U.S.C. § 3184, the magistrate judge certifies its ruling and the docket to the Secretary *only if* he or she finds the evidence sufficient to sustain the charges. *See* 18 U.S.C. § 3184 (*If, on such hearing, he deems* the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), *he shall certify* the same, together with a copy of all the testimony taken before him, to the Secretary of State . . .") (emphasis added). If the individual is not extraditable to begin with, the Secretary of State has no authority to make any decision as to his or her extradition. A challenge on this basis would not attack the substance of the Secretary of State's decision, which is generally not subject to judicial review except for on limited constitutional grounds, but rather would challenge the Secretary of State's authority to act at all.

It is telling that Venckiene can identify only one example of a court considering a challenge to the magistrate judge's ruling at this stage. But this is likely due to the fact that most parties opt to file a habeas petition before the Secretary of State's decision is issued thereby automatically

staying extradition rather than risk receiving an unfavorable decision and having to face the burden Venckiene now faces in moving the Court to enter a stay on her behalf. Certainly, Venckiene might have avoided a great deal of trouble had she done so, but she elected to forego the automatic stay in hopes of securing a favorable outcome and quicker release from custody by presenting her arguments directly to the Secretary of State.

Regardless, the only finding the Court can make with certainty is that nothing in the statute, applicable case law, or other authority *prohibits* Venckiene from filing her habeas petition challenging the magistrate judge's ruling until after the Secretary of State makes its determination or the Court from hearing the petition so long as the review is limited only to whether Venckiene was extraditable in the first instance, *i.e.* whether the matter should have been certified to the Secretary of State at all. The question remains, however, as to what effect granting a habeas petition challenging the magistrate judge's ruling would have on the petitioner's extradition status. But the Court need not address that issue now in considering whether to grant a stay. It is sufficient to find that the Court can consider Venckiene's claims challenging Judge Martin's certification order.

**B.     Motion to Stay**

Habeas corpus review of an extradition magistrate's order is limited to determining "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Eain*, 641 F.2d at 509 (citing *Fernandez*, 268 U.S. at 312). Venckiene argues in her petition that the offenses charged fall within the "political offense" exception of the Treaty and that the magistrate court erred in finding probable cause with respect to certain charges. In assessing the motion for a stay, the Court considers first

whether Venckiene has made a strong showing that she is likely to succeed on these claims. "It is not enough that the chance of success on the merits be 'better than negligible,'" *Nken*, 566 U.S. at 434 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)); "[m]ore than a mere 'possibility' of relief is required." *Id.*

### 1. *"Political Offense" Exception*

The Treaty provides that "Extradition shall not be granted if the offense for which extradition is requested is a political offense."[5] The Treaty does not define "political offense." "The operative definition of 'political offenses' under extradition treaties as construed by the United States limits such offenses to acts committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion." *Eain*, 641 F.2d at 518.; *see also, e.g., Escobedo*, 623 F.2d at 1104; *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971).

Courts generally recognize two forms of political offenses: "pure" political offenses, *i.e.* an "act that is directed against the state but which contains none of the elements of ordinary crime" such as treason, sedition and espionage, and "relative" political offenses, *i.e.*, "common crimes . . . so connected with a political act that the entire offense is regarded a political." *Eain*, 641 F.2d at 512; *see also, e.g., Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1359 (11th Cir. 2012); *Nezirovic v. Holt*, 779 F.3d 233, 240 (4th Cir. 2015); *Barapind v. Enomoto*, 400 F.3d 744, 755 (9th Cir. 2005); *Quinn v. Robinson*, 783 F.2d 776, 794 (9th Cir. 1986).

---

[5] Whether the offenses charged qualify as "political offenses" is a distinct issue from whether the request itself is politically motivated. The magistrate judge decides the former, *see Eain*, 641 F.2d at 513-15 ("[T]he Judicial branch has consistently determined whether or not the "political offense" provision applies to the crime charged . . .[T]he extradition statute requires the magistrate to determine that the crime alleged is listed in the applicable treaty, and that the provision of the treaty relating to political offenses does or does not apply."), while the Secretary retains sole discretion under the rule of non-inquiry (as discussed above) to consider the latter.

Venckiene argues that the charges against her constitute relative political offenses. To qualify as a "relative" political offense, the offense must satisfy two prongs: (1) it must have involved an uprising or other violent political disturbance, such as war, revolution or rebellion and (2) must have been incidental to, in the course of, or in furtherance of the alleged uprising. *See Ordinola v. Hackman*, 478 F.3d 588, 611 (4th Cir. 2007) ("Virtually every court to encounter the question of whether the alleged crime is a relative political offense has applied this two-pronged test."); *see, also, e.g., Meza*, 693 F.3d at 1359; *Nezirovic*, 779 F.3d at 240; *Barapind*, 400 F.3d at 755.

Venckiene was a judge in Lithuania from 1999 to 2012. (Dkt. 1 at ¶ 5). In 2008, her brother's four-year-old daughter reported that she had been sexually molested by various individuals in the Lithuanian legislature and judiciary while in her mother's care. (*Id.* at ¶ 7). Venckiene and her brother filed complaints against these individuals, which Venckiene claims were ignored. (*Id.* at ¶ 8). In 2009, two of the accused were shot and killed; soon thereafter, Venckiene's brother's dead body was discovered and Venckiene became the child's legal guardian. (*Id.* at ¶ 9). Venckiene claims the highly publicized pedophilia case ignited a grassroots political movement and anti-graft political party called "Way of Courage." (*Id.* at ¶ 10). Venckiene became the party's voice and eventually the party chair. (*Id.*). In 2010, another accused was found dead. (*Id.* at ¶ 11). In 2011, the Court ordered the child be returned to her mother but the child refused. (*Id.* at ¶ 13). In 2012, officers physically assaulted Venckiene's mother-in-law in an attempt to remove the child from Venckiene's home. (*Id.* at ¶ 14). During a second attempt at transferring the child, 100 protestors gathered at Venckiene's home as 200 police officers descended on the home. (*Id.* at ¶ 15). The officers forcibly removed the child from Venckiene, injuring Venckiene's right shoulder in the process, and detained a majority of the protesters. (*Id.*)

Venckiene was charged with hindering the activities of a bailiff and resisting a civil servant for her actions related to the transfer of the child to her mother. Venckiene also claims that she was the subject of at least one assassination attempt through apparent sabotage of her vehicle. (Dkt. 19 at ¶ 17).

Venckiene argues that the "organized protest against the Lithuanian authorities that overflowed into violence" constitutes an uprising or violent political disturbance and that her alleged hinderance and resistance were incidental to the uprising. (Dkt. 13 at 17).

The Seventh Circuit considered what constitutes an uprising or violent political disturbance for purposes of the "political offense" exception in *Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981). Specifically, in *Eain* the Seventh Circuit considered whether the "finding of a 'conflict' is sufficient to establish that there exists . . . 'a violent political disturbance, such as a war, revolution or rebellion.'" 641 F.2d at 519. There, the petitioner was a member of the Palestine Liberation Organization charged by the State of Israel with setting off a bomb in 1979 that killed and injured several civilians. The magistrate had found that a conflict existed in the Middle East after the occupation of Israel in the West bank. *Id.* at 519. In determining whether the "conflict" constituted a sufficient violent political disturbance, the Seventh Circuit struggled to determine what degree of violence would be sufficient:

> An on-going, defined clash of military forces may be significant because that is one backdrop which may bring into sharp relief an individual act of violence. Once the circumstances move away from that context, the judiciary's task of determining what degree or type of violent disturbance permits a successful invocation of the political offense exception becomes more difficult.

*Id.* at 520. The court ultimately found that the PLO's attempt to destroy the Israeli political structure by targeting civilians should not be considered "a violent political disturbance" because such finding would encourage terrorism. *Id.*

Of course, Venckiene's case is distinguishable from *Eain* because the Way of Courage's activities are not directed at civilians. *Eain* is still instructive, however, because the protest against Lithuanian authorities is far from a "clash of military forces" on the spectrum of violent disturbances. In fact, the only violence Venckiene alleges are the deaths of three of the accused and her brother, injuries to her mother-in-law and her, and the assassination attempt against her.

Other courts have held that showings of greater degrees of violence than Venckiene alleges did *not* constitute an uprising or violent political disturbance, for example, in *Vo v. Benov*, 447 F.3d 1235, 1238 (9th Cir. 2006). The Ninth Circuit has held that the "uprising" component makes the "political offense" exception "applicable only when a certain level of violence exists and when those engaged in that violence are seeking to accomplish a particular objective." *Quinn v. Robinson*, 783 F.2d 776, 807 (9th Cir. 1986). "The exception does not apply to political acts that involve less fundamental efforts to accomplish change or that do not attract sufficient adherents to create the requisite amount of turmoil." *Id.*

In *Vo v. Benov*, the petitioner was a member of the Government of Free Vietnam (GFVN), a political party formed to dismantle the Communist dictatorship of Vietnam, and charged with attempting to bomb the Vietnamese embassy in Bangkok. 447 F.3d at 1238. To support his claim that an uprising existed in Vietnam at the time, the petitioner pointed to thousands of signatures on a petition for freedom and a handful of GFVN attacks on the Vietnamese government and claimed that members of GFVN had been murdered and imprisoned for their actions. *Id.* at 1242. Applying *Quinn* and other prior decisions, the Ninth Circuit held that "in order to constitute an uprising, a conflict must involve either some short period of intense bloodshed or an accumulation of violent incidents over a long period of time." *Id.* at 1242. With regard to the petitioner's claim, the court held that the "sum of a few skirmishes with the police, coupled with a handful of

explosions and bombing attempts around the Pacific Rim and a keen desire to see the downfall of the communist regime in his native land" did not reach the necessary level of violence to amount to an uprising. *Id.* at 1243; *C.f. Ordinola*, 478 F.3d 588at 599 ("uprising" existed where "Peruvian government and the Shining Path were engaged in a violent struggle for control of the country" and "approximately 50 percent of Peruvian territory and approximately 65 percent of the country's population was under a state of national emergency") (internal citation omitted); *Barapind*, 400 F.3d at 750 (uprising existed where "tens of thousands of deaths and casualties resulted between the mid-1980s and early 1990s as Sikh nationalists clashed with government officers and sympathizers in Punjab").

Venckiene's allegations of violence are even less than those rejected by the court in *Vo*. The events set forth in Venckiene's Petition were clearly traumatic, and the Court in no way means to minimize the violence and horrendous actions Venckiene's family has endured or the pain they continue to suffer as a result. But the Court cannot consider Venckiene's allegations in a vacuum. The Court is bound by the provisions of the Treaty and is permitted to intervene in the extradition process at this stage only to the narrow extent provided by controlling case law. That case law is clear that for the "political offense" exception to apply, Venckiene must show a much greater degree of violence than she has been able to demonstrate here.

Venckiene cites zero cases supporting her claim that the political party's actions and protests are sufficient to constitute an uprising for purposes of establishing the "political offense" exception. Venckiene fails to meet her burden of showing that she will likely succeed on her claim that the political offense exception applies.

## 2. Probable Cause

Before certifying a person as extraditable, a magistrate judge "must find probable cause under federal law that the person committed the offense he is charged with by the foreign government." *Bovio*, 989 F.2d at 258 (citing *Eain*, 641 F.2d at 507-08). Judge Martin found probable cause to believe Venckiene committed two of the offenses charged: hindering the activities of a bailiff and resisting a civil servant or person performing the functions of public administration. On habeas review, the Court reviews the magistrate judge's probable cause finding to determine whether there is "any competent evidence" to support the judge's finding. *Id.* Accordingly, "a magistrate judge's finding of probable cause to support extradition will be upheld if 'there is *any competent evidence* to support her finding.'" *Cheung v. Nicklin*, No. 12 C 9500, 2013 WL 6498553, at *2 (N.D. Ill. Dec. 10, 2013), *aff'd* (Feb. 7, 2014) (emphasis added) (citing *Bovio*, 989 F.2d at 258). "This limited scope of review is commensurate with the limited scope of inquiry in the extradition hearing itself." *Id.* "An extradition hearing is not a plenary trial at which guilt or innocence is decided; rather, it is in the nature of a preliminary examination to determine whether probable cause exists to hold the fugitive for trial in the requesting country." *Id.* (citing *Collins v. Loisel*, 259 U.S. 309, 216)); *see also, e.g., In re Mazur*, No. 06 M 295, 2007 WL 2122401, at *19 (N.D. Ill. July 20, 2007).

To succeed on her habeas claims, Venckiene must show that there was no evidence warranting Judge Martin's probable cause findings. *See, e.g., id*, at *2 (review of a probable cause finding on habeas petition "is limited to assessing whether there was *any* evidence warranting the original finding") (emphasis in original) (internal citations omitted). Moreover, in order for the Court to grant her stay, Venckiene must establish that she will likely be able to make such showing. Venckiene fails to do so with regard to either charge.

Article 231 of the Lithuania Criminal Code provides,

> 1. A person who, in any manner, hinders a judge, prosecutor, pre-trial investigation officer, lawyer or an officer of the International Criminal Court or of another international judicial institution in performing the duties relating to investigation or hearing of a criminal, civil, administrative case or a case of the international judicial institution or hinders a bailiff in executing a court judgment shall be punished by community service or by a fine, or by restriction of liberty, or by imprisonment for a term of up to two years.
>
> 2. A person commits the act indicated in paragraph 1 of this Article by using violence or another coercion shall be punished by a fine or by arrest or by imprisonment for a term of up to four years.

(Dkt. 1 at 16-17).

Article 286 of the Lithuanian Criminal Code provides:

> A person who, through the use of physical violence or threatening the immediate use thereof, resists a civil servant or another person performing the functions of public administration shall be punished by community service or by a fine, or by imprisonment for a term of up to three years.

(Dkt. 1 at 19).

The charges against Venckiene for violating these provisions of the Code are based on the same set of facts: that she refused to comply with court orders to transfer custody of the child to the child's mother including by assaulting an officer at her home during execution of the order. According to the evidence submitted by the Lithuanian government, during the pretrial investigations, the child's mother and the bailiff responsible for effectuating the transfer reported that Venckiene repeatedly failed to turn over the child as ordered and deferred attempts to transfer the child by saying the child did not want to go to her mother. *See, e.g., In re Extradition of Jarosz,* 800 F. Supp. 2d 935, 947 (N.D. Ill. 2011) ("So long as the exhibits submitted by the requesting nation are certified and authenticated in accordance with the relevant statute, the evidence [in an extradition hearing] may come from a prosecutorial report."). The bailiff reported that, when law enforcement arrived at Venckiene's home to take custody of the child, Venckiene had erected

obstacles around her home and refused to remove the barricades on her doors when the officers knocked and announced their presence, forcing the officers to use special equipment to enter the home. The bailiff reported further that, once inside, Venckiene refused to allow others to communicate with the child, shouted, held the child with her hands around her waist and began kicking the child's mother. The bailiff reported also that officers, including an Officer Mindaugas Gusauskas, had to take Venckiene's hands off of the child to allow the mother to take the child. Other officers at the scene confirmed the bailiff's account. Gusauskas reported that after the child left the room, Venckiene stood up and punched him twice in the right side of his face. Another officer observed the punches and the injuries were documented by medical records.

Based on this evidence, there was more than sufficient evidence to support Judge Martin's finding of probable cause that Venckiene hindered the bailiff in executing the court's transfer order—*i.e.,* by refusing to turn over the child, barricading the child in her home, preventing the officers from physically removing the child, etc.—and that Venckiene used physical violence to resist a civil servant or other person performing the functions of public administration—*i.e.,* by kicking the child's mother and punching the officer executing the court's order. In other words, Venckiene cannot show that there is *no* evidence supporting the probable cause finding.

Plaintiff argues that a transcript of the events transpiring the day the officials came to Venckiene's house to remove the child negates any finding of probable cause. "Neither the federal rules of evidence, nor the federal rules of criminal procedure apply" in an extradition hearing. *In re Mazur*, 2007 WL 2122401, at *19 (citing *Eain,* 641 F.2d at 508). Generally, "[a]n accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial"; "[t]o do otherwise would convert the extradition into a full-scale trial, which it is not to be." *Eain*, 641 F.2d at 511. However, the accused may present

evidence that "obliterates" the probable cause finding. *In re Mazur*, 2007 WL 2122401, at \*19. Venckiene argues the transcript "obliterates" the probable cause finding because there is no indication in the transcript that Venckiene kicked the mother or punched the officer.

The transcript does not "obliterate" the probable cause finding. First, the transcript ends as the child is being taken out of the house, before Venckiene allegedly punched the officer. Second, the transcript only reports statements, not actions, between the individuals present. While the transcript *may* capture statements indicating that a physical altercation occurred, that is not necessarily the case and the absence of such statements does not prove that no physical assault occurred. Finally, even if the transcript showed clearly that no physical assault occurred, it far from obliterates the hindering charge because the transcript substantiates the bailiff's claim that Venckiene erected barriers to prevent the officers from entering her house to execute the transfer order. (*See, e.g.,* Dkt. 13 at Ex. 17 ("Bailiff: Police officers are asked to remove the obstacles . . . Please remove the obstacles.")).

Additionally, Venckiene argues for the first time in her supplemental brief that there are videos from the incident that should be collected and produced prior to denying the stay. (Dkt. 29 at ¶ 19). Venckiene provides zero details about these videos, for example, what they will show or how they will make Venckiene more likely to succeed on her habeas petition, except to say that they are "relevant to explain what happened on the day the offenses occurred." (*Id.*). Without more, this eleventh hour attempt to stay the Court's ruling based on new evidence is unconvincing and, as discussed already, the evidence proffered by the Lithuanian government provides ample support for Judge Martin's probable cause findings. *See, e.g., Peroff,* 563 F.2d at 1101 (Even in light of newly discovered evidence, "the evidence proffered by the Swedish authorities in their

request for Peroff's extradition amply supports the original finding of probable cause to believe that Peroff participated in the crimes charged.").

Therefore, Venckiene fails to make a strong showing that she will likely succeed on the merits of her challenges to the magistrate judge's certification order. The remaining stay factors favor denying the motion for a stay for the same reasons discussed above. Venckiene's only irreparable harm—that her outstanding legal claims related to her extradition will become moot— is tempered by the fact that she may still present a defense before the Lithuanian courts and prompt execution of removal orders facilitates international rule of law and promotes public interest.

Venckiene's Motion for Extension of Stay is denied with regard to all claims challenging Judge Martin's Order certifying her as extraditable.

## III. Pending Congressional Bills

On June 25, 2018, New Jersey Representative Christopher Smith presented to Congress a bill titled "Give Judge Venckiene Her Day in Court Act" that seeks "the relief of Judge Neringa Venckiene, who the Government of Lithuania seeks on charges related to her pursuit of justice against Lithuanian public officials accused of sexually molesting her young niece." H.R. 6218. Illinois Representative Randy Hultgren introduced an identical bill on June 27, 2018. *See* H.R. 6257. If enacted, either proposed bill would exclude Venckiene from the Treaty and all other laws allowing for her extradition to Lithuania and allow her free movement and the ability to work in the United States until a final order is issued on her pending asylum application. H.R. 6218; H.R. 6257. Venckiene also submitted a June 9, 2018 letter from Representative Smith, in which Smith states that he expects the bill will move more quickly than a typical private bill because, unlike typical private bills, HR 6218 seeks only to give Venckiene access to the normal political asylum process and not to give her legal permanent status. (Dkt. 31-1). In the letter, Representative Smith

states also that he is working with the Judiciary Committee to achieve fast-track processing for the bill. (*Id.*)

Venckiene's stay request based on the pending Congressional bills is subject to the same four-factor analysis under *Nken*. Therefore, Venckiene bears the burden of showing that the pending bills warrant an exercise of the court's discretion in her favor, including by making a strong showing that she is likely to succeed on the merits, *i.e.*, that her extradition will likely be prevented by the passage of either bill. But Venckiene's brief is devoid of *any* such argument. First, Venckiene provides no precedent—and the Court knows of none—for a court staying execution of a warrant of surrender issued by the Secretary of State until Congress could vote on a pending proposed bill. Second, except for Representative Smith's assurances that the bill will move more quickly than a typical private bill, Venckiene provides no timeline for the voting process. As of July 12, 2018, neither bill had been put to a vote in the House. Third and most importantly, Venckiene fails to address at all the likelihood that either bill will pass the House, pass the Senate, receive approval from the President and become law. Of course, this is undoubtedly because she has no way of making such a prediction. The Court certainly has no way of knowing and will not blindly guess as to when or how Congress will act.

Venckiene fails to address whether, much less make a strong showing as to, the likelihood either bill will prevent her extradition. Because the other stay factors also favor denial for reasons already discussed, the Court denies Venckiene's Motion for Extension of Stay based on the pending Congressional bills.

**CONCLUSION**

For the reasons stated above, the Court denies Venckiene's Motion for Extension of Stay (Dkt. 9).

Although the Court has ruled on the likelihood Venckiene will succeed on the merits of her habeas petition, the Petition is not yet fully briefed. Because the Court has found that it has the authority to hear Venckiene's challenges to the Secretary of State's extradition determination and Judge Martin's certification order, the Court directs the parties to submit briefing on Venckiene's pending Petition. Additionally, the Court permits Venckiene to first amend her Petition to include the challenges raised for the first time in her supplemental brief, if so desired.

Hon. Virginia M. Kendall
United States District Judge

Date:  July 12, 2018